UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHARON RADFAR, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| CITY OF REVERE, BRIAN M. ARRIGO, | * | |
| individually and in his official capacity as | * | |
| Mayor, JAMES GUIDO, individually and in | * | |
| his official capacity as Chief of Police, | * | Civil Action No. 1:20-cv-10178-IT |
| JOSEPH I. COVINO, individually and in his | * | |
| official capacity as Police Sergeant, and | * | |
| OTHER AS YET UNNAMED OFFICERS | * | |
| OF THE REVERE POLICE | * | |
| DEPARTMENT, individually and in their | * | |
| official capacity as police officers, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

December 5, 2024

TALWANI, D.J.

Plaintiff Sharon Radfar alleges that Defendant Joseph Covino used his position as a law

enforcement officer with the City of Revere to spread false and malicious claims about her and,

in doing so, interfered with her job with the George Mason University Police Department and

caused her emotional distress in violation of federal and state law. Before the court is Defendant

Joseph Covino's Motion for Summary Judgment [Doc. No. 68]. For the following reasons, the

motion is GRANTED.

I.    **Procedural Background**

Plaintiff's Complaint [Doc. No. 1] named the City of Revere, its Mayor, Brian M. Arrigo,

and Chief of Police, James Guido (collectively, the "Revere Defendants"), and Joseph I.

Covino.[1] The Revere Defendants moved to dismiss the counts directed against them pursuant to Fed. R. Civ. P. 12(b)(6), Revere Defs.' Mot. to Dismiss [Doc. No. 18], and the court granted their motion. Mem. & Order [Doc. No. 21].

Covino moved to dismiss the Complaint pursuant to Massachusetts' anti-SLAPP law, M.G.L. c. 231, § 59H, Fed. R. Civ. P. 12(b)(6), and Fed. R. Civ. P. 56. Covino's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56 and Special Mot. to Dismiss and Mot. for Costs and Atty's Fees Pursuant to M.G.L. c. 231, § 59H [Doc. No. 9]. The court denied Covino's anti-SLAPP motion because he had not demonstrated that Radfar's action was brought to chill his protected petitioning activity, denied his 12(b)(6) motion because it relied on matters outside of the pleadings, and denied his summary judgment motion without prejudice. Mem. & Order [Doc. No. 21].[2]

Once discovery closed, Covino filed the pending renewed Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("Motion for Summary Judgment") [Doc. No. 68] seeking summary judgment on all counts in the Complaint. Radfar opposes the motion. Opp'n in Resp. to 2nd Mot. for Summ. J. ("Pl.'s Opp'n") [Doc. No. 81].[3]

---

[1] The Complaint also asserted claims against "as yet unnamed officers," who four years later remain unnamed.

[2] The court recognized that some of the legal arguments raised successfully by the Revere Defendants also potentially applied to Covino, but where Covino did not raise these arguments and Plaintiff did not address the arguments as they may apply to Covino, the court did not extend the rulings to Covino. Id. at 24, n.9. The court provided, however, that after filing an answer and conferring with counsel, Covino could file a motion for judgment on the pleading under Fed. R. Civ. P. 12(c) raising those arguments that may apply to him. Id. Covino did not file a 12(c) motion.

[3] At the hearing on the summary judgment motion, Radfar's counsel contended that there are open discovery disputes in this matter, including an unresolved motion to compel, that prevented Radfar from having all necessary discovery to dispute Covino's summary judgment motion. Federal Rule 56(d) provides that, when facts are unavailable to a non-movant, and the non-movant shows by affidavit or declaration that, for specified reasons, the non-movant cannot present facts essential to justify an opposition to a summary judgment motion, the court may

II.     **Standard of Review – Summary Judgment**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Ins. Co., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 323-324.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 324. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S.

provide certain relief. Radfar did not file a Rule 56(d) affidavit. Nor is there an unresolved motion to compel on the docket. To the extent that Radfar's objection is that Covino failed to comply with the court's Electronic Order [Doc. No. 53] granting in part Radfar's Motion to Compel [Doc. No. 39], she could have filed a motion regarding that alleged failure under Fed. R. Civ. P. 37(b). In the absence of a Rule 56(d) affidavit, an open motion to compel, or a Rule 37(b) motion, the court finds that any argument that discovery was incomplete has been waived.

at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

### III.    Factual Background Viewed in the Light Most Favorable to Radfar

A.    *Radfar's Employment Record with George Mason University Prior to Her Relationship with Covino*

Plaintiff Sharon Radfar began her employment with the George Mason University Police Department in January 2001. Pl.'s Resp. to Def. Covino's First Interrogatories 6 [Doc. No. 70-2]. Lieutenant David Ganley, who started his employment shortly after Radfar and worked with her consistently from 2003 to 2010 (during 2008 and 2010, as a sergeant and her supervisor) and, once promoted to the rank of lieutenant in 2016, supervised all patrol operations including those on which Radfar worked, considered Radfar an officer with "good instincts" who "did good work." Tr. of Ganley Dep. 15, 17, 24 [Doc. No. 70-8]. Lt. Ganley once nominated Radfar for George Mason's officer of the year. Id. at 23-24.

Radfar's employment record with George Mason was not entirely unblemished. In August 2001, roughly 6 months after Radfar started working at George Mason, she was issued a "Written Notice" for "engag[ing] in conduct unbecoming a police officer[.]" Id. at 19. The Notice specified that Radfar was accused of a criminal violation, which led the Commonwealth Attorney for Fairfax County to withhold her appointment as a sworn police officer, such that her

conduct "placed the department in disrepute and adversely affected the efficiency of the department." Id. at 20. As a result of the incident, Radfar's swearing in was delayed for about a year. Id. at 21.

In June 2005, Radfar received another Written Notice from George Mason. Id. at 24. That incident involved Radfar using the George Mason Police's access to the Virginia Criminal Information Network ("VCIN") "improperly for noncriminal justice purposes." Id. As a result of the VCIN incident, Radfar's VCIN access was suspended for six months. Id. at 27.

B.    *Lt. Ganley's Knowledge of Radfar's Difficult Romantic Relationships*

Lt. Ganley observed a pattern of behavior by Radfar regarding her romantic relationships with other officers. Lt. Ganley had knowledge of the 2001 incident resulting in the delayed swearing in, and that it involved a relationship between Radfar and a Fairfax County sheriff's deputy. Id. at 21. Radfar had been accused of breaking into the deputy's house and stealing some photos and other items, but she was never charged. Id. at 20.

Lt. Ganley was also aware of Radfar's relationship with Office Tom Bacigalupi from their department, who Radfar started dating soon after she graduated from the police academy. Id. at 32-33. From Lt. Ganley's observations, Radfar's relationship with Bacigalupi was "tumultuous" and "volatile from the beginning." Id. at 31, 33. Lt. Ganley was aware that the 2005 incident with the VCIN terminal involved Radfar looking up information on Bacigalupi, who Radar was dating at the time, and confronting Bacigalupi with that information. Id. at 25-27.

Lt. Ganley also recalled:

> lots of instances where [Bacigalupi and Radfar] would break up, she would call him time and time and time – I mean, literally back to back to back.

> I was in the car with him one time traveling from a training in Virginia Beach back to northern Virginia and she called his phone. He wasn't answering. She called his phone probably about a hundred times just back to back to back. Every time it would stop ringing, she would dial again and ring again.

> I saw this from both sides. When I was on her squad, I'd seen her sit in a conference room with a phone and just dial the number repeatedly. I'm assuming it was [Bacigalupi's] number at the time. I'm not 100 percent sure, but that was probably who she was calling, and he wasn't answering. This happened a lot.

Id. at 33-34.

Lt. Ganley recalled that Radfar would confront Bacigalupi at work and "they would have some pretty big arguments" and he often observed them screaming at each other on the phone. Id. at 34. According to Lt. Ganley, there were a few instances between Radfar and Bacigalupi that resulted in internal investigations because they "created such disruption," including a hearing with the Department of Human Resource Management circa 2007 that was not documented in Radfar's personnel file. Id. at 36. At some point, Lt. Ganley met with the associate director of Human Resources and urged her to "get [Radfar] in counseling [and] have her sit down with someone," but he was not sure if any actions were actually taken. Id. at 36-37.

Lt. Ganley also recalled another relationship that Radfar had after Bacigalupi with a trainer at her gym and that "something happened between them and there was [an] instance where the Loudoun County Sheriff's Office was called to the gym because of her conduct." Id. at 35.

C.    *Radfar and Covino's Relationship between June 2015 and July 2016*

In June 2015, Radfar met Joseph Covino, a sergeant with the Revere Police Department in Revere, Massachusetts, Compl. ¶ 4 [Doc. No. 1], at the World Police and Fire Games hockey tournament in Fairfax, Virginia. Pl.'s Statement of Undisputed Facts in Opp'n to Def. Second Mot. for Summ. J. ("Pl.'s SUF") ¶¶ 1-2 [Doc. No. 80]. During that event, Radfar and Covino had a brief, consensual affair. Id.

After Covino returned to Massachusetts, he and Radfar remained in contact via text messages and phone calls. Def.'s Answers to Pl.'s First Set of Interrogatories 2 [Doc. No. 70-3].

Later that summer, Radfar visited Covino in Boston. Id. at 2-3. The two had lunch and then dinner, after which Covino brought Radfar to her hotel and told her he no longer wished to continue their relationship. Id. at 3. The pair reconciled, however, and Radfar visited Boston again in the fall of 2015 with a friend. Id. During that trip, Covino met up with Radfar and her companion, but later become frustrated with Radfar's behavior and decided to take Radfar to her hotel and leave. Id.; Pl.'s SUF ¶ 2 [Doc. No. 80]. After leaving Radfar at her hotel, Covino told her via a phone call that he did not wish to have any type of relationship with her and that he wanted her to stop contacting him. Pl.'s SUF ¶ 3 [Doc. No. 80]. After making this statement, Covino continued to text and call her. Id.

In May of 2016, Covino received a series of text messages. The messages included:

I'm here in ur state! Making few minutes to [expletive] see me face to face! I'm NOT asking u! So make it happen

I'm here in ur state!!!! Make few minutes to see me face to face! I'm NOT asking u ! Make it happen!!!!!!!!!!!!!!

Don't make me come to ur place!!!

Keep ignoring that I'm here…I [expletive] will show up…and will make a scene !

May 2016 Text Messages 1-2 [Doc. No. 70-4]. Covino responded to the messages, which he believed were from Radfar, stating: "Leave me alone. I don't want any contact with you.. I do not want to and will not see you." Id. In response, he received a text threatening to "show up at ur house !" with Covino's street address. Id. Covino reiterated that he did not want to see Radfar, objected that she'd called him over 20 times in the past few hours, and asked that she stop contacting him, to which he received the response: "I don't give a [expletive] what you wish! Talk to me and I will stop !!! Or don't.. And I have [to] show up! You[r] choice!" Id. at 3. Covino again reiterated that he wanted the contact to stop. Id. at 4.

On or about July 2016, Radfar drove eight hours from her home in Virginia to the Boston area. Pl.'s SUF ¶¶ 5, 9 [Doc. No. 80]. During that trip, Radfar showed up at the Revere Police Department, where Covino worked, without warning and without knowing whether Covino was working at the time, and left a letter for him. Id. ¶ 13; Tr. of Radfar Dep. 72 [Doc. No. 70-5]. The primary purpose of Radfar's trip to Boston was to visit a cousin in Plymouth County, with whom she had dinner while in town. Pl.'s SUF ¶¶ 10-11 [Doc. No. 80].

D.    *Chief Carl Rowan, Jr.'s Initial Interactions with Radfar*

Carl Rowan, Jr. began as a consultant for the George Mason University Police Department in July 2016 and became Interim Chief of Police shortly thereafter. Tr. of Rowan Dep. 12 [Doc. No. 70-10].[4] It was important to Chief Rowan that the officers "would have a clean slate" with him and that "whatever personality problems existed in the past or what people had done or said" were not his concern. Id. at 13-14. He was aware that Radfar "had been a difficult individual to manage and that there were a number of prior incidents, disciplinary issues, and performance issues," but that was the extent of his information about her. Id. at 14. Chief Rowan recalled that the personality issues and conflicts were not unique to Radfar, and that "[i]t was a department that had a problem with [cliques] . . . just groups of officers that were at loggerheads with each other, a lot of petty personal stuff." Id.

Radfar met with Chief Rowan, who told her that he was not interested in refereeing past problems and that he was "starting fresh." Id. Following that conversation, Chief Rowan received a few complaints about Radfar being rude to people on campus, so he called her into his office "to remind her of the benefit that she was being given by giving her a clean slate." Id. at

---

[4] Rowan served as Interim Chief until November 2017, when he became Chief of Police. Id. The court refers to him throughout as Chief Rowan.

15. Chief Rowan described that Radfar began the meeting matter-of-fact, requesting more detail about the allegations and "kind of having a normal conversation." Id. at 15-16.

> Then that stopped. And we went into what I'll call the waterworks phase, it was crying and basically being the victim and "why are people always attacking me" and kind of sobbing. And then that stopped on a dime. And then came statements like—I mean just glaring—"They've tried to beat me before, and I've beaten them every time, and I'm going to beat you too." It was like three different personalities in the course of this short period of time. I found that to be disturbing. And I spoke with the employee relations department about it because I was just, I was disturbed by the experience.

> So that was my introduction to difficult Sharon. I mean, during that same time period, I mean I actually wrote her a commendation letter for something that she had recommended, and we wound up implementing her idea. But there was a continuing problem with the manner in which she treated people, and I found her behavior in that meeting to be disturbing.

Id. at 16.

E.    *Radfar's Contact with Covino Following the July 2016 Visit to Boston*

Following her July 2016 visit to Boston, Radfar continued to contact Covino through numerous telephone calls, texts, written letters, and social media. Pl.'s SUF ¶ 16 [Doc. No. 80].

During this period, Radfar also left Covino dozens of profanity-laden voicemails, accusing Covino of ignoring her, sleeping with other woman, particularly with an Irish hockey player named Lorna Hoey with whom Radfar was convinced Covino was having an affair, and being racist toward Radfar because of her Iranian heritage. Ex. 19, Disc of Voicemail Records Submitted to the Ct. [Doc. No. 70-19].

In January 2017, Radfar called Covino hundreds of times.[5] Covino also blocked over 100 different phone numbers which he believes to be calls from Radfar. Pl.'s SUF ¶ 17 [Doc. No.

---

[5] The parties dispute the exact number of calls. Covino asserts that over Martin Luther King Weekend, January 14-16, 2017, Radfar called him over 400 times, and that, a couple of weeks later, Radfar called him over 100 times on January 28, 2017, alone. Pl.'s SUF ¶ 17 [Doc. No. 80]. Radfar states that those specific numbers "were not credited by the investigation of plaintiff[,]" id., but does not deny that she made a large number of calls.

80]. Radfar also spliced pictures of herself with photos of Covino she found on social media and sent them to Covino. Id.

F.    *Covino's Initial Contact with the George Mason Police Department*

At some point following MLK weekend in 2017, Covino called the George Mason University Police Department and asked to speak to the on-duty supervisor. Id. ¶ 21. The on-duty supervisor that day was Lt. Ganley. Id. ¶ 22. Covino told Lt. Ganley "that he had a problem with one of our officers that he was dating" and mentioned Officer Radfar by name. Tr. of Ganley Dep. 29 [Doc. No. 70-8]. Covino asked for Lt. Ganley's assistance in getting Radfar to stop contacting him and told Lt. Ganley that Covino "wanted a clean break from her" and "[d]id not want her contacting him, coming up there, or interfering with his work or his family." Id. at 30. Lt. Ganley told Covino that his complaints were "consistent with Officer Radfar in past relationships that [he] had heard of." Id. at 31. Lt. Ganley told Covino "there's really nothing you can do until she latches on to the next guy, because that's what she's been doing down here." Pl.'s SUF ¶ 32 [Doc. No. 80].

G.    *George Mason's Initiation of a State Police Investigation*

After receiving Covino's phone call, Lt. Ganley reached out to Chief Rowan. Id. ¶ 34. Chief Rowan was not surprised by the allegations. Id. ¶ 46. Lt. Ganley told Chief Rowan that "with the department's history with Officer Radfar," Covino's allegations "obviously needed to be investigated," but that it would be more proper for an agency other than George Mason University to conduct the investigation because of the officers' personal relationships with Radfar. Id. ¶ 35.

Following his conversation with Lt. Ganley, Chief Rowan set up a meeting with the Virginia State Police. Id. ¶ 47. At that meeting, Chief Rowan asked the Virginia State Police to conduct a criminal investigation into Radfar. Id. ¶ 48. Chief Rowan has no memory of ever

10

speaking directly with Covino and made that request even though, to his knowledge, Covino never requested any criminal investigation be made into his allegations. Id. ¶¶ 49-50.

On January 25, 2017, Lt. Ganley emailed Covino to inform him that George Mason University was looking into Radfar's conduct and use of police resources. Id. ¶ 54. In the email, Lt. Ganley wrote to Covino: "My Chief wanted me to ask if you would be willing to file a police report with your local department? I know that's a big ask but he wants to have something to back up our investigation." Id.

On January 26, 2017, Lt. Ganley and Chief Rowan met with Special Agent William Kinnard of the Virginia State Police. Id. ¶ 52. The state police record of the investigation contains a synopsis of the meeting written by Agent Kinnard which recounts that "Chief Rowan state[d] he was requesting a criminal investigation and stated the suspect, one of his officers, MPO Sharon Radfar, did not need to be a police officer." Id. George Mason's complaint, as summarized by Kinnard, was that Radfar had been harassing and possibly threatening a Boston police officer since summer 2015. Id. According to Agent Kinnard's summary, "[a]ll of [t]he command group in attendance concurred that Radfar was volatile and possibly manic in her relationships." Id.

In a January 27, 2017 communication with Covino, Agent Kinnard stated that he had been assigned to investigate Covino's complaint against a member of the George Mason University Police Department. Id. ¶ 55. Agent Kinnard stated further that his investigation would require "a high degree of accurate documentation[]" and asked Covino to provide Kinnard "any and all records, documents, messages, or transmissions" as well as information about his phone service carriers. Id.

Both Lt. Ganley and Agent Kinnard also advocated to Covino that he obtain a restraining order. Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

    H.    *Covino's "To File" and Incident Reports and the Abuse Prevention Petition, Order, and Expiration*

On January 29, 2017, in response to Lt. Ganley's request, Covino authored a "To File" report with the Revere Police Department outlining his relationship with Radfar. Id. ¶ 56. He also authored an "Incident Report," which listed himself as the Reporting Officer and the Victim and Radfar as the "Suspect" for an offense of criminal harassment. Id.

On January 31, 2017, Covino applied for an Abuse Prevention (or "209A") Order in the Lynn District Court in Massachusetts. In his affidavit in support of his application, Covino wrote that Radfar had "repeatedly attempted to contact [him] by any means necessary" including "telephone, text, written letters, social media, driving from [Virginia] to [Massachusetts] and showing up in my neighborhood or at my place of work." Abuse Prevention Order Aff. [Doc. No. 70-7]. He also wrote that "Radfar [had] used threats to force him into sexual relations with her on multiple occasions being successful on one attempt while in Boston." Id. Covino stated that Radfar had called or texted him over 400 times on MLK weekend and had called him over 100 times on January 28, 2017. Id. He also accused Radfar of assuming the identities of people online in an attempt to contact him and befriending and harassing other law enforcement officers that Covino knew. Id. Covino stated that "[b]ecause of her repeated actions/threats," he was "in absolute fear of grave danger from Radfar[.]" Id.

While waiting to appear before the judge, Covino asked Lt. Ganley whether, if an order requiring the surrender of firearms came through, it should be sent to the George Mason University Police Department or to the local township, and Ganley responded that he "would

much rather have it here [at George Mason] so we can coordinate and we can get the firearm

back."  Tr. of Abuse Prevention Order Hr'g 7 [Doc. No. 79-1].

At the hearing on the Abuse Prevention petition, Covino testified that "on at least three

occasions" Radfar had driven to Massachusetts and shown up in his neighborhood threatening

Covino to come see her, and that he believed the last time she had visited Massachusetts to be

December 2016. Tr. of Abuse Prevention Order Hr'g 3-4 [Doc. No. 79-1]. When the judge asked

why Covino had "pick[ed] today to come in," Covino said that he had "been putting it off

because I . . . know what a restraining order entails and . . . [hadn't] been in fear of [his] safety

until the most recent threats" but that he now "can't even sleep anymore [because] [t]he phone

just rings all night." Id. at 5. Covino testified further that Radfar had made veiled threats by

voicemail, had appeared in his neighborhood, and had access to a firearm, and that as a result he

was concerned for his safety. Id. at 6.

The judge reminded Covino that any order he issued regarding the surrender of firearms

would not be enforceable in Virginia and that enforcement of the order would be up to law

enforcement in Virginia. Id. at 7. At the end of the hearing, the judge issued a temporary Abuse

Prevention Order that would expire on February 15, 2017, unless extended. Id. at 9.

Covino did not seek to extend the Abuse Prevention Order against Radfar and it therefore

expired on February 15, 2017. Pl.'s [Additional] Material Facts ¶¶ 7, 8 [Doc. No. 80]. There is

no indication in the record that Covino ever told either George Mason or the Virginia State

Police that the order had expired. Id. ¶ 10.

I.    *George Mason University Serves the Abuse Prevention Order, Seizes Radfar's*
      *Gun, and Places Her on Leave*

The same evening that Covino obtained the Abuse Prevention Order, George Mason

University Police Officers and Loudoun County Sheriff Deputies served it on Radfar at her home

and seized her firearms. Pl.'s SUF ¶ 63 [Doc. No. 80]. Radfar was also given a letter from

George Mason placing her on administrative leave per Virginia state personnel policy and

advising her that a confidential investigation conducted by an external investigator would be

conducted and a no trespass order directing her to stay away from Covino and George Mason

University property. Id. ¶ 64; see also, Ex. 15, Administrative Leave Letter [Doc. No. 70-15]; No

Trespass Letter [Doc. No. 70-16]; Virginia State Police Investigation R. 9 [Doc. No. 70-11].

> J.      *Virginia Prosecutor's Review of the State Police Investigation*

The Virginia State Police investigation record indicates that the Revere Police

Department and Covino provided to Agent Kinnard documentation, including "a package with

copies of voicemails and text messages from Radfar" and "Covino Report from Revere PD."

Virginia State Police Investigation R. 9 [Doc. No. 70-11]; see also Virginia State Police R.

Investigation 41-43 (Incident Report and To File Report) [Doc. No. 70-11]. In February 2017,

Agent Kinnard sought and obtained a search warrant for the phone records of both Covino and

Radfar. Id. at 10.

On March 27, 2017, Agent Kinnard gave his investigation notes to Assistant

Commonwealth Attorney Alex Rueda "for review and prosecutorial guidance." Pl.'s SUF ¶ 74

[Doc. No. 80]. With the materials, Agent Kinnard wrote: "Analysis of the suspect phone records

show: Suspect called victim at least 575 times over the affected period and at least 162 times

since I can prove that the victim said 'do not call me anymore' (See text message of March 12,

2016). Victim called suspect at least 256 times and 32 times since he told her to stop calling

him." Id. Agent Kinnard asked Attorney Rueda if she would prosecute the case and if there was

enough to charge Radfar under Virginia's statute prohibiting "[u]se of profane, threatening or

indecent language over public airways or by other methods," a Class 1 misdemeanor. Id. ¶¶ 74-75; see also Ex. 18, Code of Virginia § 18.2-427 [Doc. No. 70-18].

Attorney Rueda emailed Agent Kinnard on March 28, 2017:

> Just finished reviewing all the materials. We do not have enough for telephone threats charges because I don't really see her making actual threats, it's all veiled. And the profanity doesn't fall under the legal definition of obscene under the Virginia Code or case law. Honestly, our best bet would be to potentially charge her with stalking, but it would be a real stretch, because he would have to be able to stay(sic) he has a reasonable fear of bodily injury or death to himself or a family member. Also, most of this behavior is occurring in Massachusetts. She is traveling up there to stalk him, has shown up at his work, says she is near his house and demands he meet her, and is receiving all the phone calls and text messages there. Has he sought a protection order in the Massachusetts courts or sought charges up there? If we get a misdemeanor warrant down here, there is no provision for the court to pay for him to fly down here at the General District Court level. Massachusetts has jurisdiction so it seems a much better plan to have her charged up there.

Pl.'s SUF ¶ 76 [Doc. No. 80]. In another email to Agent Kinnard, Attorney Rueda stated that she probably had enough to charge Radfar under Virginia's statute for "causing a telephone . . . or other device to ring or signal with intent to annoy," but that there was not much purpose in charging her with only a class 3 misdemeanor when Covino would have to travel to Virginia. Id. ¶ 77. She reiterated that Covino should pursue charges in Massachusetts, where the conduct was occurring. Id.

On May 5, 2017, Agent Kinnard met with Attorney Rueda who reported that she and the Commonwealth Attorney agreed that prosecution should not go forward and that Covino could try to apply for a permanent protective order against Radfar in Virginia. Id. ¶ 80. Agent Kinnard notified Lt. Ganley that the Commonwealth was not going to prosecute. Id.

K.    *Jason Ford's Abuse Prevention Order Against Radfar*

On December 3, 2017, Brockton, Massachusetts, police officer Jason Ford applied for an obtained an Abuse Prevention Order against Radfar in the Brockton District Court. Id. ¶ 104.

Like Covino, Ford also contacted the George Mason University Police Department about Radfar's conduct. Id. ¶ 106.[6]

## IV.    Discussion

Radfar's Complaint asserts nine counts against Covino: equal protection violations for abuse of authority (Count I), selective prosecution (Count II), defamation (Count III), violations of the Massachusetts Civil Rights Act (Count IV), intentional infliction of emotional distress (Count V), conspiracy to violate civil rights (Count VII), refusal to prevent wrongs committed against Plaintiff (Count VIII), abuse of process (Count IX) and malicious prosecution (Count X). Covino seeks summary judgment as to all counts.

### A. *Uncontested Causes of Action*

#### 1.    Selective Prosecution (Count II)

Radfar alleges that Covino's "repeated selective enforcement of the law . . . violated [her] rights to equal protection of the laws and the privileges and immunities of citizenship" enumerated in the Fifth and Fourteenth Amendments. Compl. ¶¶ 30 [Doc. No. 1]. Radfar did not address this count in her opposition to the summary judgment motion and, at the hearing on the

---

[6] Radfar alleges that Ford's Abuse Prevention Order, like Covino's, was based on false and misleading statements about her and that Ford's conduct also contributed to the loss of her job. Id. ¶¶ 105, 107. On January 6, 2021, Radfar submitted a letter of resignation to the George Mason University Police Department effective on that date. Id. ¶ 114. The details of Radfar's resignation from George Mason University's Police Department are subject to a Non-Disclosure Agreement she entered into which has not been made available to Defendants or this court. Further, at the summary judgment hearing, Radfar clarified that she is only seeking damages against Covino with regard to his role in the loss of her employment for the period between Covino's initial call to Lt. Ganley in January 2017 and December 3, 2017, the date of the Ford Abuse Prevention Order, though she also seeks ongoing damages against Covino for emotional and psychological distress. Because Radfar has conceded that she does not seek to recover for any loss of her employment after December 2017, and because she entered into an agreement to keep the details of her resignation confidential, the court does not consider any events between Radfar and the George Mason University Police Department that transpired after Officer Ford obtained his Abuse Prevention Order against Radfar.

motion, her counsel conceded that Radfar is no longer asserting a selective prosecution claim

against Covino. Summary judgment as to Count II is therefore granted.

### 2.   Section 1985 Conspiracy to Commit Wrongs (Count VII)

The court dismissed the conspiracy claim as to the other Defendants at the motion to

dismiss stage, finding that "Plaintiff has failed to allege any facts tending to show the existence

of a conspiracy among Covino, Arrigo, and Guido (or any configuration of two Defendants)."

Mem. & Order 22 [Doc. No. 21]. Because Covino is the only remaining party discussed in Count

VI, and because Radfar does not address the conspiracy claim in her opposition to Covino's

pending summary judgment motion, the court grants summary judgment as to Count VI.

### 3.   Section 1986 Refusal to Prevent Wrongs Committed Against Plaintiff (Count VII)

A claim under 42 U.S.C. § 1986 depends on the existence of a conspiracy under § 1985.

See Hahn v. Sargent, 523 F.2d 461, 470 (1st Cir. 1975) ("[T]he dismissal of appellant's claim

under § 1986 falls upon the rejection of his § 1985 claims."). Because the court has dismissed the

§ 1985 conspiracy claim for failure to demonstrate any facts tending to show a conspiracy

between the Defendants, and because Radfar does not address this claim in her opposition to

Covino's summary judgment motion, the court grants Covino summary judgment as to Count

VIII.

## B.   *Contested Claims*

### 1.   Section 1983 Equal Protection (Count I)

Plaintiff alleges under § 1983 that Covino violated the guarantees of equal protection

under the Fifth and Fourteenth Amendments of the Constitution by (a) acting under the color of

law to (b) initiate malicious proceedings against Radfar. Compl. ¶¶ 26-27 [Doc. No. 1].

Section 1983 creates a civil cause of action against an individual acting under color of state law

who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law" and "second, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). Covino seeks summary judgment on the grounds that, at all times relevant to the Complaint, he acted not in his capacity as a Revere Police Officer, but as a private citizen. Def.'s Mem. 8 [Doc. No. 69]. Covino also contends that, regardless of whether he acted under color of law, there is no evidence that Radfar was denied a constitutional right by Covino. Id.

   Plaintiff has offered no evidence from which a jury could find that Covino was acting under color of law rather than as a private citizen when he obtained the abuse prevention order. Covino's affidavit in support of his abuse prevention order complaint does not identify him as a law enforcement officer and mentions only that Radfar has visited his "place of work," without specifying that he worked at the Revere Police Department. Abuse Prevention Order Aff. [Doc. No. 70-7]. Further, he appeared at the abuse prevention order hearing while he was off-duty and out of uniform. During the hearing, Covino did reference "[his] police department" and stated that he and Radfar met at a police event, and after receiving the Order told the judge "[w]e miss you over in Chelsea," see Tr. of Abuse Prevention Order Hr'g [Doc. No. 79-1], but these statements do not suggest that Covino was acting under color of law rather than as a private citizen while obtaining the abuse prevention order. Accordingly, the court need not reach Radfar's claim that she was deprived of her constitutional rights to equal protection by Covino seeking (and obtaining) the Abuse Prevention Order.

   Radfar also asserts that Covino "used his police power and department resources" in drafting his internal to file and incident report with the Revere Police Department and "made

18

much use of his use of police evidence gathering procedures," including "placing materials in the Revere Police Department evidence room and then having a detective who was his friend transmit them to Virginia State Police in an effort to establish the impression that the use of regular police procedures, professionalism and objectivity would lend credibility" to his allegations made in an effort to charge Radfar with a crime. Pl.'s Opp'n 12-13 [Doc. No. 81]. The court agrees that the evidence supports Radfar's claim that Covino was acting under color of law in writing up the internal to file and incident report. But Radfar can show no constitutional violation in connection with George Mason's investigation of her and its impact on her job.

Plaintiff has attempted to frame Covino's contact with George Mason University Police, the investigation, and her placement on administrative leave as an equal protection claim. But to succeed on an equal protection claim, a plaintiff must show that, as compared to others similarly situated, she was selectively treated and that such selective treatment was based on impermissible considerations. Latimore v. Trotman, 651 F.Supp.3d 366, 375 (D. Mass. 2023) (citing Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013)). "Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim[.]" Ayala-Sepulveda v. Municipality of San German, 671 F.3d 24, 32 (1st Cir. 2012) (citing Estate of Bennett v. Wainwright, 548 F.3d 155, 166 (1st Cir. 2008)).

There is no evidence in this record of any comparator against whom to judge Covino's treatment of Radfar and thus no evidence of actual disparate treatment. Radfar complains that Covino instigated a malicious and false campaign against her, but makes no allegation, nor is any supported by the record, that he singled her out in this treatment as compared to other similarly situated individuals. "An equal protection claimant may not prevail . . . simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a

discriminatory animus." <u>Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mortg.</u> <u>Fin. Corp.</u>, 246 F.3d 1, 10 (1st Cir. 2001) (internal citations omitted). Accordingly, the equal protection claim fails and summary judgment as to Count I is granted.

   2.   Violations of Massachusetts Civil Rights Act (Count IV)

Radfar asserts that Covino deprived her of rights under the Massachusetts Declaration of Rights, M.G.L. c. 12, § 11H, by means of intimidation and coercion. Compl. ¶ 37 [Doc. No. 1]. She claims that Covino "endeavored to interfere with her right to travel to the Commonwealth as well as her right to her employment and her right to privacy." <u>Id.</u> She seeks relief under M.G.L. c. 12, § 11H "because [he] engaged in said threats, coercion and intimidation under color of law in violation of said statute" and § 1983. <u>Id.</u> ¶ 38.

"[U]nder the MCRA, . . . the plaintiff must identify a federal or state right that has been 'interfered with by threats, intimidation, or coercion.'" <u>Barbosa v. Conlon</u>, 962 F.Supp.2d 316, 332 (D. Mass. 2013) (quoting <u>Flesner v. Technical Commc'ns Corp.</u>, 410 Mas. 805, 818, 575 N.E.2d 1107 (1991)).

> A "[t]hreat" ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. "Intimidation" involves putting in fear for the purpose of compelling or deterring conduct.... ["Coercion" involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.

<u>Farrah ex rel Estate of Santana v. Gondella</u>, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (quoting <u>Planned Parenthood League of Mass., Inc. v. Blake</u>, 417 Mass. 467, 474, 631 N.E.2d 985 (1994)). Here, though Radfar asserts that Covino made "abusive threats" toward her, <u>see</u> Pl.'s Opp'n 2 [Doc. No. 81], she has offered no evidence that Covino's communications with her were intended to make her fearful or constrain her from doing what she was otherwise lawfully entitled to do. Without such evidence, no reasonable jury could find that Covino's behavior was

20

threatening, intimidating, or coercive as required for an MCRA claim. Accordingly, summary

judgment as to Count VIII is granted.

        3.   Defamation (Count III)

Radfar claims Covino defamed her by making statements he knew to be false to her

employer and others that she committed criminal acts. Compl. ¶¶ 32-34 [Doc. No. 1]. Radfar

alleges that Covino's statements caused her to suffer grievous injury to her reputation and the

loss of her ability to earn a living. Id. ¶ 35. Covino contends that summary judgment on Radfar's

defamation claim is appropriate because (a) Covino's statements were protected petitioning

behavior, and (b) protected or not, the statements were true. Def.'s Mem. 14 [Doc. No. 69].

Radfar's opposition does not address Covino's request for summary judgment on Count

III for defamation other than to state generally that some of Covino's statements to George

Mason University about Radfar were "false[,] misleading, humiliating and otherwise

defamatory[.]" Pl.'s Opp'n 8 [Doc. No. 81]. At the hearing, however, Radfar's counsel took

issue with two statements in particular: (1) Covino's statement in his affidavit in support of the

complaint for an Abuse Prevention Order that Radfar forced him to have sex; and (2) Covino's

statement in the Incident Report that Radfar committed the crime of criminal harassment under

M.G.L. c. 265, § 43A. Radfar contends that both statements, because they are assertions that she

committed a crime, are actionable as defamation per se.[7]

---

[7] During the hearing, Radfar's counsel also took issue with Covino's statements to the Lynn
District Court that Radfar had called him thousands of times, when the Virginia State Police
investigation concluded she called him 575 times. The court, reviewing the transcript of the
abuse prevention hearing [Doc. No. 79-1] and Covino's affidavit in support of the Abuse
Prevention Order complaint, could not find any allegation made by Covino that Radfar called
him "thousands" of times. Nonetheless, even if Covino had told the judge that Radfar called him
thousands of times, this discrepancy would not be material when it is undisputed that Radfar
called Covino at least 575 times.

Under Massachusetts law, to survive a motion for summary judgment for defamation, a plaintiff must establish that "(1) the defendant published a false statement regarding the plaintiff—that is, the defendant communicated the statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; and (3) the statement caused economic loss or is otherwise actionable without proof of economic loss." Flagg v. AliMed, Inc., 466 Mass. 23, 37, 992 N.E.2d 354 (2013); see also Brauer v. Globe Newspaper Co., 351 Mass. 53, 55-56, 217 N.E.2d 736 (1966) (quoting Muchnick v. Post Pub. Co., 332 Mass. 304, 306, 125 N.E.2d 137 (1955)) ("A publication is defamatory when it tends to injure one's reputation in the community and to expose him to hatred, ridicule, and contempt"). A false statement that an individual has committed a crime is defamatory per se and is actionable without proof of economic loss. See Shafir v. Steele, 431 Mass. 365, 373, 727 N.E.2d 1140 (2000).

a.     Statements Made in Pursuit of Abuse Prevention Order

Radfar contends that Covino's statement that she forced him to have sex is defamatory per se because it is an accusation of sexual assault. It is undisputed that Covino wrote that Radfar had used threats to force him into sexual relations in his affidavit in support of his Abuse Prevention Order Complaint and that, if false, such an allegation is defamatory per se so long as it is actionable. But the only place that the allegation of sexual assault appears in the record is in the affidavit Covino submitted to the Lynn District Court, and Massachusetts law provides an absolute privilege against defamation for statements made by a witness or party in judicial proceedings. See Correllas v. Viveiros, 410 Mass. 314, 321, 572 N.E.2d 7 (1991); see also Sriberg v. Raymond, 370 Mass. 105, 108, 345 N.E.2d 882 (1976). Because Covino only made the statement about sexual assault in the affidavit submitted to the Lynn Dsitrict Court, that

statement is not actionable. Accordingly, to the extent Radfar's defamation claim depends on that statement, summary judgment on Count III is granted.

b.    Statements made in Covino's Incident Report

Radfar also contends that the Incident Report authored by Covino that lists Radfar as the suspect for an offense of criminal harassment under M.G.L. c. 265, § 43A, is defamatory per se because it falsely accuses Radfar of committing a crime. Section 43A criminalizes whoever willfully and malicious engages in a "knowing pattern of conduct or series of acts" over a period of time and directed at a specific person, "which seriously alarms that person and would cause a reasonable person to suffer substantial emotional distress." M.G.L. c. 265, § 43A. The conduct covered by § 43A includes, but is not limited to, conduct or acts conducted via telephone or the internet. Id.

Generally speaking, "defamatory statements are not punishable unless they are capable of being proved true or false." Pan Am Sys., Inc. v. Atlantic Northeast Rails and Ports, Inc., 804 F.3d 59, 65 (1st Cir. 2015). Radfar has offered no evidence that the statement in Covino's Incident Report that she criminally harassed him is untrue, nor were her counsel's arguments regarding criminal harassment at the motion hearing persuasive. For example, Radfar's counsel contended at the hearing that culpability under M.G.L. c. 265, § 43A, requires that the acts directed at a victim are threats of physical or bodily harm. But while the statute is directed to conduct "which seriously alarms" the victim and is of such a nature that would cause a reasonable person "to suffer substantial emotional distress," id., a threat of physical or bodily harm is not a requirement of criminal harassment under § 43A.[8] Counsel also argued that

_____

[8] Criminal stalking, M.G.L. c. 43, in contrast, does require a threat with intent to place a person in imminent fear of death or bodily injury, but Covino did not allege criminal stalking.

Covino's statement that Radfar criminally harassed him was defamatory because the criminal investigation based on that accusation cleared Radfar. This is not accurate. The Virginia State Police investigation, which did consider as part of its record Covino's Incident Report, resulted in a decision not to press charges against Radfar in Virginia. It did not, however, conclude that Radfar had committed no wrongdoing. The fact that the investigation did not result in criminal charges does not mean that Radfar's conduct did not meet the requirements of § 43A. Accordingly, summary judgment for Covino is granted on Count III in its entirety.

4. Intentional Infliction of Emotional Distress (Count V)

Radfar alleges that Covino's "acts and omissions constituted outrageous conduct and intentionally inflicted emotional distress upon [her]." Compl. ¶ 40 [Doc. No. 1]. She further alleges that that misconduct caused her to experience stomach problems, weight loss, nightmares, anxiety, and fear of police officers. Id. ¶ 41.

"Massachusetts law imposes liability for intentional infliction of emotional distress when the defendant has engaged in extreme and outrageous conduct, without privilege, causing the plaintiff severe emotional distress." Gill v. United States, 588 F. Supp. 3d 134, 139 (D. Mass. 2022) (citing Limone v. United States, 579 F.3d 79, 91 (1st Cir. 2009)). Finding extreme and outrageous conduct requires the conduct be "beyond all bounds of decency and . . . utterly intolerable in a civilized community." Sena v. Commonwealth, 417 Mass. 250, 263, 629 N.E.2d 986 (1994).

Though Radfar does not identify the particular conduct of Covino's she believes rises to the level of "extreme and outrageous," the court considers the combination of Covino allegedly omitting certain evidence from materials provided to George Mason University and Virginia State Police during their investigation and making false or exaggerated statements about Radfar

to her employer, the Lynn District Court, and Virginia State Police. But even if Radfar proves these allegations, no reasonable jury could find that that conduct rises to the level of "extreme and outrageous" in light of the undisputed evidence that Radfar relentlessly called and texted Covino and Covino sought the abuse prevention order and contacted Radfar's employer only after she refused his requests to stop.

Accordingly, summary judgment in favor of Covino on Radfar's intentional infliction of emotional distress claim (Count V) is granted.

     5.  Abuse of Process (Count IX)

Radfar alleges that Covino was not entitled to an Abuse Prevention Order against her and that, nonetheless, Covino maliciously sought such an order to exact revenge against Radfar. Compl. ¶ 53 [Doc. No. 1]. She contends that this conduct constituted an abuse of process that caused her humiliation, embarrassment, anguish, loss of reputation in her community, and loss of her career. Id. ¶ 54-55.

In Massachusetts, a party claiming abuse of process must show (1) that "process" was used against him, (2) for an "ulterior or illegitimate purpose," and (3) that he was damaged as a result. Psy-Ed Corp. v. Klein, 459 Mass. 697, 713, 947 N.E.2d 520 (2011). "[I]n the context of abuse of process, 'process' refers to the papers issued by a court to bring a party or property within its jurisdiction." Jones v. Brockton Public Markets, Inc., 369 Mass. 387, 389-390, 340 N.E.2d 484 (1975) (finding process was that used by the defendant to institute its suit seeking a preliminary injunction, and not the injunction prohibiting picketing subsequently issued by the court). "To sustain the claim, 'the fact finder must find that process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." Psy-Ed Corp., 459 Mass. at 713. "More

specifically, abuse of process has been described as a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'" Vittands v. Sudduth, 49 Mass. App. Ct. 401, 406, 30 N.E.2d 325 (2000) (quoting Cohen v. Hurley, 20 Mass. App. Ct. 439, 442, 480 N.E.2d 658 (1985)).

Radfar claims that Covino pursued the Abuse Prevention Order "with the ulterior motive of exacting revenge against [her] and destroying her career and her life." Compl. ¶ 54 [Doc. No. 1]. She contends that Covino "was [] never fearful of her" as required for a 209A order and that the petition was "calculated," "target[ed,]" and based on false statements to the judge. Pl.'s Opp'n 16 [Doc. No. 81]. She also argues that Covino "us[ed] [] the Massachusetts order to ruin her career and seek out of state criminal charges against her." Id. Taking the facts in the light most favorable to Radfar, the court finds these assertions as to Covino's motivation unsupported by the evidentiary record.

First, even accepting Plaintiff's argument that Covino may have exaggerated any fear of physical harm that he may have had, Covino's deposition testimony that his "only concern" in taking action against Radfar's harassment "was having her stay away from [him]," Tr. of Covino Dep. 31 [Doc. No. 70-9], is uncontradicted.

Second, there is ample, uncontradicted evidence in the record that Covino did *not* intend to destroy Radfar's life or her career by seeking to stop her harassment. In his affidavit, Covino asserts that at no point did he seek to have the defendant charged with criminal activity. Id. At his deposition, Covino testified that, when he contacted Lt. Ganley about Radfar's conduct, "I only wanted to—I didn't want to cause her to lose her job. I certainly didn't want to have a restraining order against her, and I did everything I could not—so that wouldn't happen." Tr. of Covino Dep. 20 [Doc. No. 70-9]. Further, it is undisputed that Covino let the Abuse Prevention

Order lapse after two weeks. Covino testified that he allowed the Order to lapse "so that the plaintiff's employment was not negatively impacted by her inability to possess a firearm." Covino Aff. ¶ 19 [Doc. No. 70-14]. While the record suggests that Chief Rowan and George Mason University Police may have used the Abuse Prevention Order for their own purposes, nothing in the record suggests that this was Covino's motivation.

Despite her assertions that Covino had an ulterior motive in seeking an Abuse Prevention Order against her, Radfar proffers no evidence to support those claims. Though the court is required to view the facts in the light most favorable to the non-movant on a summary judgment motion, the non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation or denials of [the] pleadings," Anderson, 477 U.S. at 256, but most "go beyond the pleadings" and present her own evidence to demonstrate a genuine dispute of material fact for trial. Celotex, 477 U.S. at 324. The court finds that Radfar has not met that burden here and that, based on the admissible evidence in the record, no jury could find that Covino sought an Abuse Prevention Order for a purpose for which it was not designed or intended. Accordingly, summary judgment on the abuse of process claim (Count VIII) is granted in Covino's favor.

6.  Malicious Prosecution (Count X)

Radfar's malicious prosecution allegations are based on two categories of conduct. The first is Covino's actions related to and in support of George Mason University's and the Virginia State Police investigations into Radfar's conduct. The second is Covino's actions in pursuit of the Abuse Prevention Order he obtained in Massachusetts. The court addresses each in turn.

a.  Virginia Investigations

Radfar brings her malicious prosecution claim under federal law via § 1983 based on Covino's actions taken under color of law as a police officer in filing an Incident Report against Radfar[9] and providing information to Virginia authorities, which resulted in the unreasonable seizure of her firearms in violation of the Fourth Amendment.[10]

Central to a successful malicious prosecution claim is establishing that legal process was initiated against the claimant. See Nieves, 241 F.3d at 54 (an arrest without an arrest warrant is without "legal process" and therefore insufficient for malicious prosecution claim). "The common-law cause of action for malicious prosecution . . . permits damages for confinement imposed pursuant to legal process." Heck v. Humphrey, 512 U.S. 477, 484 (1994). "The interest at stake in a malicious prosecution claim is the right to be free from deprivations of liberty interests caused by unjustifiable criminal charges and procedures." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 (1st Cir 1995); see also Chervin v. Travelers Ins. Co., 448 Mass. 95, 102-03, 858 N.E.2d 746 (2006) ("The tort [of malicious prosecution] 'is not confined to the wrongful initiation of criminal proceeding; it may be maintained for the unjustifiable initiation of a civil action.'"). Here, Radfar has not been subject to civil or criminal legal process and has thus not stated a cognizable claim for malicious prosecution.

---

[9] To succeed on a § 1983 malicious prosecution claim, a plaintiff must show both a "garden variety claim of malicious prosecution," Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256 (1st Cir. 1996), plus "a deprivation of a federally-protected right." Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001). The elements of a common law action for malicious prosecution are: (1) commencement or continuation of a criminal proceeding against the plaintiff at the behest of the defendant; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the charges; and (4) actual malice. Id.

[10] To state a claim for malicious prosecution resulting in unreasonable seizure, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupportable by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

It is undisputed that Virginia declined to prosecute Radfar following its investigation into her conduct and that no criminal charges were ever brought against Radfar in Virginia or Massachusetts. The court has found no Massachusetts or federal case, and Radfar cites to none, where a malicious prosecution claim was sustained based solely on an investigation that did not result in a criminal complaint or charges. To the contrary, "[t]he mere transmission of information to a police officer, who using his or her independent judgment, then pursues the matter and institutes criminal proceedings, has never been held sufficient to support an action for malicious prosecution." Correllas, 410 Mass. at 318. Accordingly, summary judgment is granted on Count X to the extent it depends on Covino's actions related to the Virginia State Police investigation.

b.    Abuse Prevention Order

Radfar also alleges that Covino maliciously prosecuted her by abusing his position as a police officer to obtain an Abuse Prevention Order against her. A successful § 1983 claim requires a claimant to demonstrate that the defendant was acting "under color of law" by acting in an official capacity or exercising official responsibilities pursuant to state law. See Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995) ("[W]hether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."). As discussed above, Covino did not appear at the Abuse Prevention Hearing in uniform, was off-duty at the time, and did not go out of his way to identify himself as a police officer or make reference to his law enforcement position. Plaintiff has not offered evidence to support her claim that Covino was acting under color of state law, so his actions with regard to the Abuse Prevention Order hearing are not actionable under § 1983.

Accordingly, Covino's motion for summary judgment as to Radfar's malicious prosecution claim (Count X) is granted.

**V.    Conclusion**

For the foregoing reasons, Defendant Joseph I. Covino's <u>Motion for Summary Judgment</u> [Doc. No. 68] is GRANTED.

IT IS SO ORDERED.

December 5, 2024                            <u>/s/Indira Talwani</u>
                                            United States District Judge